

**U.S. Department of Justice**

Antitrust Division

---

*Washington Criminal II*

450 5th Street NW  
Suite 11-300  
Washington, DC 20001

202/598-4000  
FAX 202/598-2428

May 1, 2019

**VIA E-MAIL**

The Honorable J. Paul Oetken  
United States District Court  
Southern District of New York  
Thurgood Marshall United States Courthouse  
40 Foley Square  
New York, NY 10007

        Re:    United States v. Banca IMI Securities Corp., 19-cr-

Dear Judge Oetken:

      The United States Department of Justice, Antitrust Division ("the Government") submits this memorandum in advance of the May 10, 2019 plea hearing and sentencing of Defendant Banca IMI Securities Corp. ("IMI" or "Defendant"), a U.S. broker-dealer organized and existing under the laws of Delaware with its headquarters in New York, New York. At that hearing, the Government expects IMI to waive indictment and plead guilty to a one-count information charging it with violating Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

      For the reasons set forth below, the Government respectfully requests that the Court sentence IMI in accordance with the Rule 11(c)(1)(C) Plea Agreement entered into between the United States and IMI ("Plea Agreement"; courtesy copy attached to the same transmittal email as this memorandum), to a fine in the amount of $2,207,107[1] and a special assessment of $400, with no order of restitution and no probation imposed.[2] The Government and IMI agree that this

---

[1] As explained below, this fine amount is 30 percent below the low end of the Sentencing Guidelines range calculated by the Government and IMI. In section V of this memorandum, the Government respectfully moves the Court to approve a downward departure from the Sentencing Guidelines pursuant to U.S.S.G. § 8C4.1 because of the substantial assistance IMI has provided in this matter.

[2] The recommendation against probation is not part of the "Recommended Sentence" under the Rule 11(c)(1)(C) agreement, meaning the Court could opt to impose probation in this case without opening the door for IMI to withdraw its guilty plea. Plea Agreement ¶ 2.

sentence is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§ 3553(a) and 3572(a).

### I. Summary of the Offense

From at least as early as March 2012 and continuing until at least August 2014, IMI conspired with other broker-dealers to suppress and eliminate competition by rigging their bids to U.S. depository banks for the rates they would pay to borrow pre-release American Depository Receipts ("pre-release ADRs"). Information ¶ 8 (courtesy copy attached to the same transmittal email as this memorandum). IMI and its co-conspirators coordinated their bids through employees manning their respective securities lending desks.

Worldwide, there are thousands of publicly traded companies that list their shares of common stock only on foreign stock exchanges, not in the United States. Most U.S. investors are unable to purchase or sell such foreign shares, which also are known as "ordinary" shares. However, the U.S. Securities and Exchange Commission permits four U.S. depository banks to create financial instruments, known as ADRs, which each represent one or more foreign ordinary shares and can be traded in the United States on U.S. stock exchanges or over the counter. Through the purchase and sale of ADRs, U.S. investors are able to gain exposure to—including the ability to receive dividends from—companies whose ordinary shares are listed only on foreign exchanges.

In order to create an ADR in the United States, the depository bank is required to ensure that the corresponding ordinary share(s) are taken out of circulation in the foreign country. That process is known as "custodying" the ordinary shares. Subject to certain regulatory requirements, U.S. depository banks are permitted to release ADRs before the foreign ordinary shares are custodied—ADRs sold or lent by U.S. depository banks in that circumstance are known as "pre-release ADRs."

Prior to September 2014, there was significant, predictable demand for pre-release ADRs that corresponded to ordinary shares of a number of foreign companies each time one of those companies was about to issue a dividend. That demand derived largely from the ability of U.S. financial institutions, via a series of short-term loans of the ADRs, to place the ADRs in possession of tax-advantaged institutions (such as public pension funds or university endowment funds) on the ex-dividend date (i.e., the date on which the current holder of the ADR is entitled to receive the upcoming dividend). Because the tax-advantaged institutions holding the ADRs on the ex-dividend date were not subject to foreign tax withholding (the amounts of which varied over time and by the issuing company's home country, but typically ranged from 15% to 30% of the dividend), that "avoided tax" became available for distribution among all of the various institutions that participated in the transactions required to place the ADRs temporarily with the tax-advantaged institutions. (In some cases, the tax-advantaged institutions were located abroad and the ADRs were converted into ordinary shares before being lent to the tax-advantaged institutions; that variation did not change the amount of tax avoided.)

The division of the avoided tax among the various institutions participating in the series of short-term ADR loans historically was determined largely by bilateral negotiations, with each firm haggling for higher rates when it was the lender and for lower rates when it was the

borrower. For broker-dealers such as IMI, profitability was determined primarily by: (i) the number of ADRs it was able to borrow and then lend, and (ii) the spread between the effective rate it paid the U.S. depository bank to borrow the ADRs and the effective rate(s) it charged the investment banks, hedge funds, or other intermediaries to lend them the ADRs.

Prior to March 2012, IMI and other broker-dealers competed against one another both to contract with investment banks, hedge funds, and other intermediaries who wanted to borrow pre-release ADRs (i.e., downstream transactions) and to secure large allocations of pre-release ADRs on favorable terms from the U.S. depository banks (i.e., upstream transactions). Beginning no later than March 2012, though, IMI and its co-conspirators began coordinating their bids to the U.S. depository banks for the rates they would pay to borrow pre-release ADRs in an effort to suppress the rates at which they all could borrow pre-release ADRs from the U.S. depository banks.

In late 2012, one of the U.S. depository banks authorized to issue ADRs largely ceased negotiating pre-release ADR lending rates bilaterally with each broker-dealer and instead began using an auction-style process by which IMI and other broker-dealers were invited to submit competitive bids for the rates they would pay to borrow pre-release ADRs. The U.S. depository bank then used the broker-dealers' bids to determine how many pre-release ADRs to award to each broker-dealer and at what rate. In an effort to maintain or increase their profits under the auction-style process by suppressing competition between them and reducing the rates they all paid to borrow pre-release ADRs, IMI and its co-conspirators intensified their coordination regarding the bids they would submit to the U.S. depository bank, on many occasions agreeing that they all would submit the same bid.

Paragraph 11 of the Information lays out the Means and Methods of the conspiracy, which are described briefly below:

- **Communicating regarding bids (Information ¶ 11(a)).** Individuals employed on IMI's securities lending desk communicated with their counterparts at IMI's co-conspirators at in-person meetings and by telephone, email, and text messaging platforms such as Bloomberg. Using these methods of communication, IMI's employees and their counterparts at IMI's co-conspirators discussed the bids each would submit to U.S. depository banks to borrow pre-release ADRs. IMI's employees and their counterparts at the co-conspirators divulged specific rates they intended to bid. After bids were submitted, IMI's employees and their co-conspirator counterparts also regularly confirmed that each had in fact bid as previously disclosed.

- **Agreeing to specific bids (*id.* at ¶ 11(b)).** Individuals employed on IMI's securities lending desk and their counterparts at IMI's co-conspirators agreed to suppress and eliminate competition by rigging bids to borrow pre-release ADRs from U.S. depository banks, including on many occasions by agreeing on the specific bids IMI and one or more co-conspirator broker-dealers would submit to U.S. depository banks for the rates they would pay to borrow pre-release ADRs.

- **Collusive borrowing (*id.* at ¶ 11(c), (d)).** By means of these communications and agreements, IMI was able to convince U.S. depository banks to lend it pre-release ADRs at collusive and noncompetitive rates, and IMI in fact paid collusive and noncompetitive rates on the pre-release ADRs it borrowed from U.S. depository banks.

In IMI's allocution, the Government expects IMI's corporate representative to acknowledge that its securities lending desk employees engaged in this conduct while employed by IMI, that they did so to benefit IMI, and that IMI is responsible in law for their conduct.

## II. Legal Standard

Rule 11(c)(1)(C) authorizes the United States to enter into plea agreements with parties in which the parties agree that a particular sentence is the appropriate disposition of the case. *See* Fed. R. Crim. P. 11(c)(1)(C). The Court, however, "retains absolute discretion whether to accept a plea agreement." Fed. R. Crim. P. 11, advisory committee's notes to 1999 amendments. As a plurality of the Supreme Court has observed:

> Federal sentencing law requires the district judge in every case to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, in light of the Guidelines and other [18 U.S.C.] § 3553(a) factors. The Guidelines provide a framework or starting point – a basis, in the commonsense meaning of the term – for the judge's exercise of discretion. Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but the agreement does not discharge the district court's independent obligation to exercise its discretion.

*Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion) (internal citations and quotation marks omitted). In exercising that discretion, while the district court may accept or reject the proposed Rule 11(c)(1)(C) plea agreement, it may not modify the agreement's terms. *United States v. Green*, 595 F.3d 432, 438 (2d Cir. 2010) (citing *United States v. Cunavelis*, 969 F.2d 1419, 1422 (2d Cir. 1992)).

## III. Sentencing Guidelines

Organizations, such as IMI, are sentenced pursuant to Chapter 8 of the Sentencing Guidelines. In the case of antitrust violations, however, there are a number of special instructions that direct the Court to the antitrust-specific guidelines provided in U.S.S.G § 2R1.1. *See, e.g.*, U.S.S.G. §§ 8C2.3, 8C2.4(b). One such guideline states that, for organizations, "in lieu of pecuniary loss under subsection (a)(3) of § 8C2.4 (base fine), use 20 percent of the affected volume of commerce." U.S.S.G. § 2R1.1(d)(1). *See also* Application Note 3 to U.S.S.G § 2R1.1 ("The purpose for specifying a percent of the volume of commerce is to avoid the time and expense that would be required for the court to determine the actual gain or loss."). The organization's culpability score, which is determined pursuant to U.S.S.G. § 8C2.5, is then used to select the minimum and maximum fine multipliers that are applied to the base fine, to determine the applicable Guidelines fine range. *See* U.S.S.G. § 8C2.6.

Here, as explained in detail in the subsections that follow, the Sentencing Guidelines generate a fine range of $3,153,010 to $6,306,021, based on the following methodology:

|   |   |   |
|---|---|---|
|   | 5 | Base Culpability Score (U.S.S.G. § 8C2.5(a)) |
|   | + 2 | Number of Employees Involved (§ 8C2.5(b)(4)) |
|   | - 2 | Cooperation and Acceptance of Responsibility (§ 8C2.5(g)(2)) |
|   | 5 | Total Culpability Score |
| $3,153,010 |   | Base Fine of 20% of Volume of Commerce (§ 8C2.4(a)(3); § 2R1.1(d)(1)) |
| * 1. 0 to 2.0 |   | Minimum and Maximum Fine Multipliers (§ 8C2.6) |
| $3,153,010 to $6,306,021 |   | Guidelines Fine Range (§ 8C2.7) |

### A. Volume of Commerce

The volume of commerce attributable to a defendant for sentencing purposes in an antitrust case is the volume of commerce "done by him or his principal in goods or services that were affected by the violation." U.S.S.G. § 2R1.1(b)(2). In this case, the conspiracy precisely targeted the portion of the dividend payments that otherwise would have been subject to foreign tax withholding. The parties accordingly have agreed that the volume of affected commerce attributable to IMI for purposes of U.S.S.G. § 2R1.1(d) is equal to the avoided tax generated by pre-release ADRs that IMI borrowed pursuant to rigged bids. *See* Plea Agreement ¶ 9(a).

The Government therefore employed the following methodology to capture volume of commerce:

- The Government identified specific transactions in which IMI employees demonstrably carried out the antitrust conspiracy by coordinating their bids with co-conspirators[3];

- The Government identified the number of pre-release ADRs IMI borrowed pursuant to each such collusive bid;

- The Government determined both (i) the dividend paid per share of each tainted pre-release ADR IMI borrowed and (ii) the foreign tax withholding rate that would have been applied to such dividends had they not be held by tax-advantaged entities over ex-dividend date;

- The Government then calculated the dollar amount of "tax avoided" for each such share by multiplying its dividend rate by its associated tax withholding rate, and calculated the total "tax avoided" for each transaction by multiplying that per-share "tax avoided" figure

---

[3] While the Government's investigation is ongoing and it remains possible that additional rigged transactions will be discovered, the Government believes that it has identified at least the vast majority, if not all, of the transactions that IMI rigged.

5

by the number of pre-release shares of the ADR issue that IMI borrowed pursuant to its collusive bid;

- Finally, the Government summed up the total "tax avoided" amounts of all the pre-release ADR shares IMI borrowed pursuant to collusive bids.

The Government believes that this methodology is a fair and appropriate way to calculate the volume of commerce attributed to IMI for Guidelines purposes. Based on this methodology, the Government calculates the volume of commerce for IMI to be $15,765,052. As detailed immediately below, the base fine is 20% of the volume of commerce, *i.e.*, $3,153,010. *See* U.S.S.G §§ 2R1.1(d)(1), 8C2.4(a)(3).

### B. Base Offense Level and Base Fine

The base offense level for an antitrust violation, under U.S.S.G. § 2R1.1(a), is 12. *See* U.S.S.G. § 8C2.1, § 8C2.3(a) (designating U.S.S.G. § 2R1.1 as the applicable provision). IMI receives a one-level increase for participating in an agreement to submit non-competitive bids, under U.S.S.G. § 2R1.1(b)(1). The volume of commerce attributed to IMI, pursuant to the methodology described above, is $15,765,052. *See* Plea Agreement ¶ 9(a). The volume of commerce thus warrants a four-level increase under U.S.S.G. § 2R 1.1(b)(2)(D). IMI's total base offense level is thus 17.

The base fine must reflect the greatest of: (1) the monetary amount listed in the Offense Level Fine Table, provided in U.S.S.G § 8C2.4(d), corresponding to the defendant's offense level; (2) the pecuniary gain to the organization from the offense; or (3) the pecuniary loss from the offense caused by the organization. *See* U.S.S.G. § 8C2.4(a)(1-3).

Offense Level Fine Table. A base offense of 17 results in a fine of $450,000 in the offense fine level table. U.S.S.G § 8C2.4(d).

Pecuniary Gain. Calculating the pecuniary gain to IMI from this conspiracy would be unduly complicated, and in such situations the Sentencing Guidelines allow a court to disregard the gain. U.S.S.G. § 8C2.4(c).

Pecuniary Loss. Under the special instruction provision of U.S.S.G § 8C2.4(b), the pecuniary loss under subsection (a)(3) for antitrust crimes is twenty percent of the organization's volume of affected commerce. *See* U.S.S.G §§ 8C2.4(b), 2R1.1(d). Twenty percent of IMI's volume of commerce is $3,153,010, which, as the greatest of the designated options in this case, serves as the base fine. U.S.S.G. §§ 8 C2.4(b), 2R1.1(d).

### C. Culpability Score

As detailed below, the Government calculates IMI's total culpability score under U.S.S.G. § 8C2.5 to be 5.

1. The Government started with a base culpability score of 5 under § 8C2.5(a).

6

2. The Government added 2 points under U.S.S.G. § 8C2.5(b)(4) because "the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense." "Substantial authority personnel" includes "individuals who, although not a part of an organization's management, nevertheless exercise substantial discretion when acting within the scope of their authority (*e.g.*, *an individual with authority in an organization to negotiate or set price levels* or an individual authorized to negotiate or approve significant contracts)." Application Note 3(C) to U.S.S.G. § 8A1.2 (emphasis added). Here, IMI had more than 50 employees and at least one of the IMI employees who participated in the antitrust conspiracy had and exercised authority to negotiate and set price levels for pre-release ADRs, *see* Plea Agreement ¶ 4(b), (k), thus meeting the definition of "substantial authority personnel." The Government therefore submits that a 2-point enhancement is warranted.

3. Finally, the Government subtracted 2 points under U.S.S.G. § 8C2.5(g)(2) because "the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct." Here, IMI promptly and fully cooperated with the Government's pre-release ADRs investigation. As evidenced by the Plea Agreement, IMI has demonstrated its recognition and affirmative acceptance of responsibility for its participation in the charged conspiracy. Thus, the Government submits that a 2-point reduction is warranted, and a total culpability score of 5 appropriate.

### D. Fine Range

Multiplying the base fine amount of $3,153,010 by the multipliers of 1.0 to 2.0 generated by the culpability score produces a fine range of $3,153,010 to $6,306,021. *See* U.S.S.G. § 8C2.7. The recommended fine of $2,207,107 represents a 30% reduction from the low end of that range. In light of the 18 U.S.C. §§ 3553(a) and 3572(a) factors discussed immediately below and IMI's substantial assistance—as set forth in the Government's motion for a Guidelines downward departure pursuant to U.S.S.G. § 8C4.1, which is incorporated into this sentencing memorandum and is set forth in the section following our discussion of the statutory factors—the Government submits that the recommended fine is an appropriate sentence for the Court to impose in this case.

### IV. Statutory Factors to Consider at Sentencing

In addition to considering the Guidelines in effect on the day of sentencing, the Court must also consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572(a) in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet specified sentencing goals. The most relevant factors in this inquiry include: the history and characteristics of the defendant and the nature and circumstances of the offense (18 U.S.C. § 3553 (a)(1)); the need for the sentence imposed to reflect the seriousness of the misconduct, to promote respect for law, to provide adequate deterrence, and to protect the public from other crimes of the defendant (18 U.S.C. § 3553 (a)(2)(A-C)); and the defendant's measures to prevent recurrence of the offense and to discipline employees responsible for the offense (18 U.S.C. § 3572(a)(8)). The Government submits that the proposed sentence contained in the Plea Agreement is sufficient, but not greater than necessary, to achieve these objectives.

### A. History and Characteristics of the Defendant and the Nature and Circumstances of the Offense

IMI is a U.S. broker-dealer whose ultimate parent company is Intesa Sanpaolo S.p.A., a global banking group headquartered in Turin, Italy. IMI employed the individuals who participated in the antitrust conspiracy, and the Government is aware of no evidence that suggests the wrongdoing was known to any individual employed by any of IMI's parent companies.

During its operation, the antitrust conspiracy went undetected by corporate superiors of the securities lending desk where it was carried out, but IMI's corporate conduct since the conspiracy ended has been exemplary. As detailed in the Government's motion for a guidelines downward departure, below, IMI has fully cooperated with the Government throughout the pre-release ADR bid-rigging investigation (and also has cooperated with the SEC in its independent investigation of separate conduct related to the same underlying pre-release ADRs). It also has taken a number of voluntary remedial actions. IMI discontinued its entire stock lending business, including its pre-release ADR business, and ███████████████████████████████ ████████. IMI also appointed a new CEO in July 2017 and adopted control enhancements, including a new antitrust compliance training program, a new U.S. antitrust compliance policy, and a new code of business conduct and ethics. In short, while IMI committed a serious offense, it has accepted responsibility and tried to correct the wrongdoing.

### B. Seriousness of the Misconduct, Respect for Law, and Deterrence

An antitrust conspiracy is, by its very nature, a serious offense. "[T]here is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) . . . , can cause serious economic harm." U.S.S.G. § 2R1.1 cmt. background. Here, IMI, through its securities lending employees, conspired to rig bids to borrow pre-release ADRs. The actions of the conspirators violated competitive principles and undermined the integrity of the pre-release ADR transactions they tainted.

The pre-release ADR lending market that was compromised by this conspiracy was a relatively small one. The Government calculated IMI's profits from the tainted transactions to total approximately $1.8 million. In light of the volume of commerce affected by this conspiracy and IMI's substantial assistance in the Government's pre-release ADR bid-rigging investigation, detailed below, the Government submits that the proposed $2,207,107 fine appropriately reflects the seriousness of this offense. The fine and guilty plea will deter other would-be bid riggers, in the financial markets and beyond. It shows that the Government will hold large corporations responsible based on the actions of their employees, and will uncover and prosecute collusion wherever it corrupts the market process, no matter how complicated the market in question may be. Yet the overall sentence is proportionate and reasonable, showing that the Government will take into account remediation steps, cooperation, and other mitigating factors in fashioning a proposed sentence tailored to the specific circumstances of the case.

### C. Measures to Prevent Recurrence of the Offense and Discipline of Employees

Since the conclusion of this conspiracy, IMI has made significant changes to its overall corporate culture regarding compliance. As noted above, the bank has replaced its CEO, overhauled its compliance measures, exited the securities lending business (which renders impossible any recurrence of this specific conspiracy), and ███████████████.

### V. Government's Motion for a Guidelines Downward Departure (U.S.S.G. § 8C4.1)

The Government respectfully moves the Court to approve a downward departure from the Sentencing Guidelines pursuant to U.S.S.G. § 8C4.1 because of the substantial assistance IMI has provided in this matter. In support thereof, the Government submits as follows:

1. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

2. ███████████████████████████████████████████████████████████████████████████████.

3. ███████████████████████████████████.

4. The Court, on the Government's motion, may reduce a defendant's sentence to reflect a defendant's substantial assistance. U.S.S.G. § 8C4.1. As detailed above, IMI has provided full and substantial cooperation, which has been of significant and useful assistance to the Government in building cases against other companies and individuals. Accordingly, the Government submits that the cooperation tendered by IMI merits a downward departure pursuant to U.S.S.G. § 8C4.1.

5. As set forth above, the Guidelines fine calculation for IMI's plea results in a fine range of $3,153,010 to $6,306,021. The Government and IMI have agreed, pursuant to Rule 11(c)(1)(C), that an appropriate disposition of this case would include a fine of $2,207,107. The recommended fine incorporates a 30 percent cooperation discount based on IMI's substantial assistance to the Government's investigation. The Government believes that this fine accurately

reflects the nature, circumstances, and seriousness of the offense, provides adequate deterrence, and is reasonable and consistent with the reductions the Government has advocated in other antitrust cases with corporate defendants that have provided similar types of cooperation.

6. The Government thus recommends and respectfully moves that its request for downward departure be granted and that IMI be sentenced to pay a total criminal fine of $2,207,107 pursuant to the terms of the Plea Agreement.

## VI. Probation and Restitution

The Government carefully considered whether to include a recommendation of probation and/or an order of restitution against IMI. The Government has determined that neither the imposition of probation nor an order of restitution would be appropriate under the circumstances of this case, for the following reasons.

### A. Probation

Pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years. Here, though, IMI has terminated the only business unit involved in the conspiracy—[REDACTED]—and has substantially strengthened its compliance infrastructure throughout the company. Accordingly, the Government does not believe the imposition of probation in this case is necessary to achieve the statutory purposes of 18 U.S.C. § 3553(a). The Government notes that, pursuant to paragraph 2(e) of the Plea Agreement, if the Court rejects this recommendation of the Government and IMI, the terms of the Plea Agreement would nonetheless remain in effect.

### B. Restitution

Pursuant to U.S.S.G § 8B1.1, 18 U.S.C. §§ 3563(b)(2), or 3663(a)(3), the Court may order a defendant to pay restitution to the victims of the offense. In an antitrust case such as this one, though, restitution is not required. And given both the availability of civil remedies (including treble damages, 15 U.S.C. § 15) and the impracticality and burden on the Government of independently calculating restitution, the Government recommends that restitution not be imposed on IMI in this case.

U.S.S.G § 8B1.1(b)(2)(B) provides that a court may decline to impose restitution when determining complex issues of fact related to the cause of action of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. *See also* 18 U.S.C. § 3663(a)(1)(B)(ii). In this case, determining the loss attributable to IMI's employees' conduct for each rigged transaction would be time-consuming and resource-intensive, almost certainly requiring expert assistance. Even developing a proxy for harm that could apply across all collusive transactions would be a highly complicated, time-intensive endeavor, which could substantially delay fulfillment of an important corporate resolution.

To be clear, the Government does not take the position that the work that would be required to ascertain an accurate restitution figure in this case simply cannot be accomplished at

all. We submit, however, that this is a paradigmatic case of the restitution analysis complicating or prolonging the sentencing process to such an extent that it would be counterproductive, especially since each of the two direct victims of this conspiracy is a sophisticated depository bank, fully capable of pursuing whatever civil remedies it deems appropriate.

### VII. Recommendation

The Government recommends that the Court sentence IMI in accordance with the Rule 11(c)(1)(C) Plea Agreement, to a fine in the amount of $2,207,107, and a special assessment of $400, with no order of restitution and no probation imposed. As detailed above, this sentence comports with the Sentencing Guidelines, is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§ 3553(a) and 3572(a), and appropriately reflects IMI's substantial assistance to the Government's investigation.

Respectfully submitted,

JAMES J. FREDRICKS
Chief, Washington Criminal II
Antitrust Division
United States Department of Justice

By: _____
Daniel McCuaig, Trial Attorney
Christina Brown, Trial Attorney
Antitrust Division, Washington Criminal II
United States Department of Justice
450 5th Street NW, Suite 11-300
Washington, DC 20001
(202) 598-4000
daniel.mccuaig@usdoj.gov
christina.brown@usdoj.gov

cc:   Joseph C. Lombard, Esq.
      Steven D. Feldman, Esq.
      Michael V. Rella, Esq.